# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**XAVIER ALEXANDER**

      **Plaintiff,**

**v.**                                          **Case No. 6:23-cv-2325-JA-DCI**

**ANDREW J. MAMONE and CITY OF ORLANDO,**

      **Defendants.**

_____/

## ORDER

This case is before the Court on Defendants' motions for summary judgment (Docs. 28 & 29), Plaintiff's responses (Docs. 30 & 31), and Defendants' replies (Docs. 32 & 35). Based on the Court's review of the parties' submissions, the motions must be granted.

## I.    BACKGROUND

In March 2020, Orlando Police Department (OPD) officers Andrew J. Mamone and Emily Melville responded to the scene of a motor vehicle accident between Plaintiff, Xavier Alexander, and non-party Christopher Gentry. (Doc. 28-1 at 12:9–15, 28:7–21; Doc. 28-2 at 14:2–20; Doc. 28-3 at 7:7–9; Doc. 30-2 at 11). Plaintiff was driving a 2007 Mercedes-Benz C-280 and Gentry was driving a 2017 Ford F-250 pickup truck. (Doc. 28-1 at 14:5–8; Doc. 28-2 at 10:18–20).

Officer Melville served as the lead investigator, with Officer Mamone assisting her. (Doc. 30-1 at 12). The accident investigation and the subsequent traffic stop were recorded on Officer Mamone's police body camera.[1]

## A.    Accident Investigation

After arriving at the scene, Officer Mamone spoke privately with Gentry while Officer Melville met with Plaintiff. (Video 1 at 17:33:00). Gentry told Officer Mamone that he was driving southbound in the left lane on Orange Avenue closely behind another vehicle when Plaintiff attempted to merge from the right lane between Gentry and that other vehicle. (*Id.* at 17:33:38–17:33:56). But Plaintiff did not have room to merge, causing the right front bumper of Gentry's truck to hit Plaintiff's left taillight. (*Id.* at 17:33:56–17:34:10). Officer Mamone inspected the right front side of Gentry's truck, observed that the truck sustained no damage, laughed, and exclaimed that "trucks always win." (*Id.* at 17:34:10–17:34:20). Officer Mamone then concluded his conversation with Gentry. (*Id.* at 17:35:10). At that point, Officer Mamone had not inspected the

---

[1] Officer Mamone recorded two separate police body camera videos in this case. The first, taken during the accident investigation, will be referred to as "Video 1." (Doc. 28-5). The second, taken during the subsequent traffic stop, will be referred to as "Video 2." (Doc. 28-6). The timestamps referred to in this order are based on the timestamps located in the upper right corner of both videos. Officer Melville failed to activate her police body camera during the incidents. (*See* Doc. 30-1 at 20–21).

damage to Plaintiff's vehicle or heard his account of the accident. (*See* Doc. 30-1 at 19).

Officer Mamone then approached Officer Melville while Plaintiff was explaining to her that he saw smoke billowing from Gentry's truck after it suddenly accelerated behind him. (Video 1 at 17:35:18, 17:35:29–17:35:34). At this point, Officer Melville had already informed Plaintiff that Gentry was at fault. (Doc. 28-1 at 29:20–30:12). Officer Mamone and Officer Melville then began a private discussion about the investigation. (Video 1 at 17:36:48).

Officer Melville explained to Officer Mamone that Plaintiff believes Gentry's vehicle sped up suddenly behind him after Plaintiff was fully merged into the left lane. (*Id.* at 17:36:49–17:37:10). Officer Mamone asked rhetorically who is at fault when an accident occurs as a result of a vehicle merging lanes, to which Officer Melville replied that Gentry may have accelerated. (*Id.* at 17:37:15–17:37:18). Officer Mamone then asked who has the responsibility to make sure the lane is open, which Officer Melville agreed was Plaintiff's responsibility. (*Id.* at 17:37:18–17:37:23). Officer Mamone rhetorically asked again who is at fault, to which Officer Melville replied, "Whatever, I never list anyone at fault, my opinion doesn't matter." (*Id.* at 17:37:24–17:37:27). Officer Mamone then argued that the damage to Plaintiff's left taillight indicated that he was at fault, to which Officer Melville responded "usually, when you get hit in the back . . ." then cut herself off and remarked that civil accidents did not

3

warrant so much police scrutiny. (*Id.* at 17:37:28–17:37:40). Officer Mamone continued to try convincing Officer Melville of his fault determination before leaving to talk with Plaintiff to "smooth it over." (*Id.* at 17:38:30–17:38:26).

Officer Mamone approached Plaintiff and asked him to explain his version of events. (*Id.* at 17:38:44). Plaintiff stated that Gentry hit him in the back, (*Id.* at 17:38:46), to which Officer Mamone responded that "If he hit you in the back . . . your taillight is stuck on his passenger side tow hook, so if he hit you in the back, it would be your driver's side." (*Id.* at 17:38:48–17:38:58). Plaintiff pointed to the damage around his left taillight and stated that it was what he meant by the "back" of his vehicle. (*Id.* at 17:39:00–17:39:04). Plaintiff explained that he safely merged into the left lane ahead of Gentry, but Gentry accelerated and rear-ended him. (*Id.* at 17:39:10–17:39:22). Officer Mamone responded that if Plaintiff's vehicle had fully merged into the left lane, then Gentry's right side tow hook would have struck Plaintiff's right taillight. (*Id.* at 17:39:30). Plaintiff remarked that he "guess[es] whatever I'm saying is not making sense to you," to which Officer Mamone replied, "it doesn't." (*Id.* at 17:39:33–17:39:35). Plaintiff's gestures became more emphatic as he continued arguing that Gentry "sped up because I got over." (*Id.* at 17:39:48–17:39:52).

Plaintiff continued to argue until Officer Mamone interjected, "Are you going to let me talk now?" (*Id.* at 17:40:04). Officer Mamone explained that Gentry had the right-of-way and that Plaintiff was obligated to ensure the lane

was clear. (*Id.* at 17:40:19–17:40:22). Plaintiff again argued that Gentry accelerated, causing Officer Mamone to shout that "[Gentry] had the right-of-way, he is in the lane." (*Id.* at 17:40:24). Plaintiff became more visibly agitated as he continued arguing his version of events, leading Officer Mamone to comment that "based off the damage, you cut him off." (*Id.* at 17:40:27–17:40:38). After Plaintiff again repeated that he was "clearly in front" of Gentry, Officer Mamone asked him to explain why his right taillight was not broken. (*Id.* at 17:40:40–17:41:01). Plaintiff said, "I was clearly in the lane, I'm not lying," and Officer Mamone replied, "You were clearly cutting him off from the lane." (*Id.* at 14:41:02–17:41:11). This led Plaintiff to comment, "You're talking like the person that was hit." (*Id.* at 17:41:13). Officer Mamone then told Plaintiff that he was at fault and began to walk back to the police vehicle. (*Id.* at 17:41:15–17:41:23).

Plaintiff then made an inaudible comment, prompting Officer Mamone to return to Plaintiff and state, "You say he hit you in the back, the rest of your bumper is not even touched, just the corner . . . what's right is right." (*Id.* at 17:41:30–17:41:46). Plaintiff, gesturing as if he were holding a steering wheel, claimed that Gentry swerved and hit him in the left taillight. (*Id.* at 17:41:44–17:41:47). The two continued talking over each other and Officer Mamone remarked, "So, one would say maybe I have a little more experience at this than you?" (*Id.* at 17:41:47–17:42:30). Plaintiff replied that he thinks Officer

Mamone is "biased" because he did not "hear [Officer Mamone] talk like that to [Gentry]." (*Id.* at 17:42:33–17:42:36). Officer Mamone replied, "that's because what [Gentry] said made sense," and walked back to the police vehicle to fill out forms.[2] (*Id.* at 17:42:42–17:45:48).

After giving the crash form to Gentry, Officer Mamone walked back over to Plaintiff, who was talking on a cell phone. (*Id.* at 17:46:00–17:46:26). Officer Mamone handed Plaintiff his information and the crash form and Plaintiff began to walk away. (*Id.* at 17:46:30–17:46:35). Officer Mamone asked if Plaintiff wanted him to explain the forms, Plaintiff replied that he did not, and Officer Mamone stated, "you're at fault, have a good day." (*Id.* at 17:46:36– 17:46:40). Officer Mamone then walked over to Gentry and said, "I'll hang tight until you get out of here, [Plaintiff] seems really upset that he's at fault." (*Id.* at 17:46:52). Plaintiff then approached Officer Mamone and asked him to print his name on the crash report form. (*Id.* at 17:47:15–17:47:20). Officer Mamone printed his name and returned the form to Plaintiff, who was still talking on the cell phone and standing next to his vehicle. (*Id.* at 17:47:50–17:47:54).

Plaintiff entered his vehicle—with the driver's side window rolled down— while Officer Mamone stood nearby. (*Id.* at 17:47:57). Officer Mamone called

---

[2] Officer Mamone can be observed writing down Officer Melville's name in the section listing "Investigating Officer" in the Online Traffic Crash Report. (Video 1 at 17:44:41).

out, "drive carefully, please," to which Plaintiff made an inaudible comment and a dismissive wave. (*Id.* at 17:48:00–17:48:03). After more inaudible comments from Plaintiff, Officer Mamone stated, "I'm not trying to instigate anything, sir, I believe you're the one who called me a 'dickhead.'" (*Id.* at 17:48:08–17:48:11). Plaintiff began to drive away, and Officer Mamone commented, "Be careful, I advise you to get off the phone when you drive," to which Plaintiff replied, "shut up." (*Id.* at 17:48:15–17:48:17). Officer Mamone continued, "or at least put it on hands-free," to which Plaintiff again replied, "shut up." (*Id.* at 17:48:20–17:48:25). Plaintiff then drove out of the parking lot, concluding Video 1. In his deposition testimony, Plaintiff stated that he said "fuck you" to Officer Mamone as he drove away. (Doc. 28-1 at 38:14–25).

## B.    Traffic Stop

Video 2 begins two seconds later with Officer Mamone initiating a traffic stop on Plaintiff. (Video 2 at 17:49:11). As Officer Mamone was initiating the stop, Officer Melville remarked, "I take this as a P.O.P.?"[3] (*Id.* at 17:49:22). Officer Mamone did not respond to Officer Melville's comment and maintains that he initiated the stop because he "noticed that [Plaintiff's] tint was illegal" as Plaintiff was driving away. (Doc. 28-1 at 20:23–21:2, 28:19–22). Officer Mamone also claims that Plaintiff's tires "squeal[ed]" as he "peel[ed] out" of the

---

[3] P.O.P." is a "common term" meaning "Pissed Off Police." (Doc. 28-1 at 28:1–2).

7

parking lot, but this was not captured on the police body camera video and was not addressed with Plaintiff during the traffic stop. (Doc. 28-3 at 44:1–20; Video 1 at 17:48:33).

After stopping Plaintiff a few blocks from the scene of the accident, Officer Mamone reintroduced himself to Plaintiff, informed him that he was being stopped for a tint violation, and requested his paperwork. (Doc. 28-3 at 30:11, Video 2 at 17:49:38–17:49:42). Plaintiff replied, "how is my tint illegal?" to which Officer Mamone responded, "I'll show you." (Video 2 at 17:49:42– 17:49:46). Plaintiff searched for his paperwork while Officer Mamone went back to the police vehicle to retrieve and calibrate the tint meter. (*Id.* at 17:51:42– 17:52:01; Doc. 28-3 at 30:8–20, 42:20–25).

Officer Mamone tested Plaintiff's driver's side window and announced that the meter indicated that the window allowed twenty-six percent light transmittance, below the statutory minimum of twenty-eight percent for front windows.[4] (Video 2 at 17:52:18). As Officer Mamone removed the meter, Plaintiff asserted that the meter "went up to twenty-eight." (*Id.* at 17:52:23). Officer Mamone then reinserted the tint meter in the driver's side window and acknowledged that the meter read as twenty-eight percent.[5] (*Id.* at 17:52:38).

---

[4] § 316.2953, Fla. Stat.
[5] The video appears to show the meter as reading twenty-six percent when it was first inserted into the driver's side window. (Video 2 at 17:52:19).

Meanwhile, Officer Mamone inserted the tint meter into Plaintiff's rear window. (*Id.* at 17:52:30). He instructed Plaintiff to "step out of the car so [he could] see the rear window," and asked him rhetorically, "What number does that say? twelve percent," which is below the Florida statutory minimum of fifteen percent light transmittance for rear windows.[6] (*Id.* at 17:52:33–17:52:40; Doc. 28-3 at 30:19–20). Officer Mamone ordered Plaintiff to return to the driver's seat and close the car door. (Video 2 at 17:52:49–17:52:59). He then instructed Officer Melville to stand by while he returned to the police vehicle to write a citation because he did not want Plaintiff "running away." (*Id.* at 17:53:03).

As he returned to Plaintiff's vehicle after writing the citation, Officer Mamone called out, "Sir, if you saw smoke coming out of the back of [Gentry's] car you would have saw his car and you probably would have avoided the accident." (*Id.* at 18:01:07–18:01:11). Plaintiff, with his driver's side door still ajar, replied, "you don't know what I saw," while Officer Mamone attempted to close the car door. (*Id.* at 18:01:11). Officer Mamone remarked, "Do you want to close the [car] door so I can hand you [your paperwork]?" (*Id.* at 18:01:12–18:01:16). Plaintiff stated that there was nothing stopping Officer Mamone from handing him the paperwork through the open door, to which Officer Mamone retorted that "it's hard when its cracked" and grabbed and fully opened the car

---

[6] § 316.2954(1)(a), Fla. Stat.

door. (*Id.* at 18:01:17–18:01:18). Plaintiff then shut the door, to which Officer Mamone remarked, "There you go, that's so much easier, isn't it?" (*Id.* at 18:01:20). Plaintiff replied, "Just give me the ticket, man, stop fucking with me." (*Id.* at 18:01:21–18:01:24).

Officer Mamone informed Plaintiff that he was still not being cited for the accident but would receive a ticket for the tint violation. (*Id.* at 18:01:28–18:01:37). Plaintiff stated that he felt the traffic stop was only to "harass[]" him because he could have been cited for a tint violation during the accident investigation. (*Id.* at 18:01:39–18:01:46). Officer Mamone responded that he "could have ticketed [Plaintiff] for careless driving at the spot [of the accident]." (*Id.* at 18:01:48). Plaintiff continued to protest, prompting Officer Mamone to return to the police vehicle to write Plaintiff a citation for careless driving in connection with the accident. (*Id.* at 18:01:56–18:08:12).

Officer Mamone returned to Plaintiff and informed him he would be cited for careless driving and the tint violation (*Id.* at 18:08:16). Officer Mamone asked Plaintiff if he had any questions regarding the careless driving ticket, and Plaintiff made no reply and refused to sign the ticket. (*Id.* at 18:08:36–18:08:58). Plaintiff then attempted to show Officer Mamone a form from a business called Pro Tint of Florida indicating that the tint installation was within the lawful range, but Officer Mamone disregarded it in favor of the tint meter reading. (*Id.* at 18:09:04–18:09:19; Doc. 28-4 ¶¶ 4–5). Plaintiff also refused to sign the tint

violation ticket, so Officer Mamone handed it to him and told him he was "free to go." (Video 2 at 18:09:28–18:09:36). The encounter was prolonged another thirteen seconds so that Officer Mamone could retrieve Plaintiff's driver's license from the police vehicle. (*Id.* at 18:09:37–18:09:50). That was the end of the encounter.

### C.    OPD Investigation

A few months later, Plaintiff presented a signed Citizen's Complaint Form to Deputy Chief of Police Jose R. Veléz based on his encounter with Officer Mamone. (Doc. 30-1 at 3). This prompted the OPD's Internal Affairs division to launch a formal investigation and prepare an investigative report, number IR 20-38. (*Id.*; Doc. 29-1 at 12:21–22). During the investigation, Deputy Veléz characterized Officer Mamone's police body camera footage from this incident as "kind of disturbing." (Doc. 30-1 at 8). Deputy Veléz stated that Officer Mamone "did not conduct himself in the same manner when dealing with one individual as he was dealing with the other one," noting that Gentry is White and Plaintiff is Black. (*Id.* at 9). The investigation determined that it is "evident Officer Mamone had pre-determined [Plaintiff] was at fault for the traffic crash" and that it is "obvious Officer Mamone was utilizing [the] tint meter incorrectly."[7] (*Id.* at 15, 19).

_____

[7] The factory user manual indicated a different calibration threshold than Officer Mamone used during the traffic stop. (Doc. 30-1 at 14). Officer Mamone

The report concluded that "Officer Mamone's actions were completely unprofessional and not in keeping with what is expected of an officer of the [OPD] and served to delegitimize the Department's efforts of applying the law without bias." (*Id.* at 20). The report recommended that Officer Mamone be found to have violated OPD RM 200-1, Standards of Conduct, which provides that "Employees shall not engage in any conduct which constitutes neglect of duty, conduct unbecoming of an officer or City employee, or any act that is likely to adversely affect the discipline, good order, or reputation of the Department." (*Id.* at 16, 20). Officer Mamone was disciplined with a written censure based on his treatment of Plaintiff. (Doc. 28-3 at 32:6–16). Moreover, both of the tickets Officer Mamone issued to Plaintiff were dismissed. (*Id.* at 33:6–13, 41:9–19; Doc. 28-1 at 38:8–18).

Officer Mamone has been the subject of two other formal investigations during his time as an OPD officer. (*See* Doc. 29-2; Doc. 29-3). In 2018, OPD Internal Affairs investigated Officer Mamone for misconduct during a traffic stop, case number 2018-IR-0009. (Doc. 29-2). As a result of that investigation, Officer Mamone was found to have violated OPD RM 900-7, Conduct Toward the Public (a) Courtesy. (*Id.* at 12). Officer Mamone was sanctioned with an

---

utilized a three percent variance when he tested the provided reference standards, but the factory user manual calls for no more than two percent. (*Id.* at 14–15). The report does not state whether Officer Mamone's misuse of the tint meter invalidated its readings.

oral reprimand.   (Doc. 29-1 at 27:14–19).   Officer Mamone was again investigated in 2019 for mistreatment of an arrestee, case number IR 19-33. (Doc. 29-3).  OPD Internal Affairs recommended Officer Mamone be disciplined for violating OPD RM 800-2, Arrests, (C) and (D), which provide that "All prisoners/detainees shall be treated humanely and with regard to their legal rights," and "It shall be the duty of each member to report any violations of this Regulation by any member." (*Id.* at 6, 8).  But these recommendations were rejected after arbitration.  (Doc. 29-1 at 29:8–13).  Officer Mamone remains employed by the OPD.  (Doc. 28-3 at 7:13–15).

Plaintiff claims that he has suffered "nightmares" as a result of his encounter with Officer Mamone and now feels nervous around police officers. (Doc. 28-1 at 60:1–61:17).  Plaintiff brings claims against Officer Mamone and the City under 42 U.S.C. § 1983 for violating his rights under the Fourth and Fourteenth Amendments.[8]  (Doc. 1-1, ¶ 34).  In their motions for summary judgment, Defendants argue that Plaintiff's constitutional rights were not violated.  Alternatively, Defendants contend that Officer Mamone is entitled to qualified immunity, that the City did not implement any policy or custom that caused the alleged violation, and that Plaintiff suffered no damages.

---

[8] Plaintiff is no longer pursuing his third claim, which alleged intentional infliction of emotional distress.  (Doc. 30 ¶ 9).

## II.    LEGAL STANDARD

On a motion for summary judgment, a district court views "all facts and reasonable inferences in the light most favorable to the nonmoving party." *Wesson v. Huntsman Corp.* , 206 F.3d 1150, 1152 (11th Cir. 2000). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is "genuine" only if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* The movant "bears the initial responsibility of informing the district court of the basis for its motion" and "identifying those portions" of the record that 'it believes demonstrate the absence of a genuine issue of material fact.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant demonstrates the absence of a genuine issue of material fact, "[t]he burden then shifts to the non[]moving party" to "present affirmative evidence to show that a genuine issue of material fact exists." *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006). To satisfy its burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

## III.    DISCUSSION

### A.    Claims Against Officer Mamone

#### 1.    *Qualified Immunity*

"A government official faced with a civil rights claim brought pursuant to 42 U.S.C. § 1983 is entitled to raise the affirmative defense of qualified immunity." *Simmons v. Bradshaw*, 879 F.3d 1157, 1162 (11th Cir. 2018). "Qualified immunity generally shields government officials from liability for civil damages 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id.* (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "The entitlement is an immunity from suit rather than a mere defense to liability . . . [and] it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). "The purpose of qualified immunity is to allow officials to carry out discretionary duties without the chilling fear of personal liability or [harassing] litigation . . . ." *McCullough v. Antolini*, 559 F.3d 1201, 1205 (11th Cir. 2009) (citing *Anderson v. Creighton*, 483 U.S. 635, 638–39 (1987)). "Because of the purpose served by the doctrine of qualified immunity, a valid defense based upon it must be recognized as soon as possible, preferably at the motion to dismiss or summary judgment stage of the litigation." *Johnson v. Breeden*, 280 F.3d 1308, 1317 (11th Cir. 2002).

To receive qualified immunity, the defendant public official "must show that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Zeigler v. Jackson*, 716 F.2d 847, 849 (11th Cir. 1983) (citing *Douthit v. Jones,* 619 F.2d 527, 533 (5th Cir. 1980)). "Once the official makes that showing, the burden shifts to the plaintiff to demonstrate that qualified immunity is inappropriate." *Alcocer v. Mills*, 906 F.3d 944, 951 (11th Cir. 2018). In this case, it is undisputed that Officer Mamone was acting within his discretionary authority when he conducted the traffic stop. *See Jackson v. City of Atlanta*, 97 F.4th 1343, 1356 (11th Cir. 2024). Thus, the burden is on Plaintiff to overcome the qualified immunity defense, which requires him to "establish both that the officer's conduct violated a constitutionally protected right and that the right was clearly established at the time of the misconduct." *Alcocer*, 906 F.3d at 951. The Court "may consider in any order whether the plaintiff has satisfied [his] burden." *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

### 2.     *Constitutionality of the Traffic Stop*

"In any § 1983 case, [a court] must begin [its] analysis by identifying 'the precise constitutional violation' the defendant has allegedly committed." *Alcocer*, 906 F.3d at 952 (quoting *Franklin v. Curry*, 738 F.3d 1246, 1250 (11th Cir. 2013)). Here, the precise right implicated by the facts Plaintiff alleges is the Fourth Amendment right to be free from unreasonable searches and

seizures arising from the traffic stop. "'[A] relatively brief encounter,' a routine traffic stop is 'more analogous to a so-called '*Terry* stop' . . . than to a formal arrest.'" *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (quoting *Knowles v. Iowa*, 525 U.S. 113, 117 (1998)). "Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop and attend to related safety concerns." *Id.* (citing *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* (citing *United States v. Sharpe*, 470 U.S. 675, 686 (1985)). There must be "reasonable suspicion" to support a traffic stop based on "specific reasonable inferences which [the officer] is entitled to draw from the facts in light of his experience." *Terry*, 392 U.S. at 27. The question "is not whether a specific arresting officer . . . actually and subjectively had the pertinent reasonable suspicion, but whether, given the circumstances, reasonable suspicion objectively existed." *Hicks v. Moore*, 422 F.3d 1246, 1252 (11th Cir. 2005).

And in the context of qualified immunity, the Eleventh Circuit has stated that "the issue is not whether reasonable suspicion existed in fact, but whether the officer had 'arguable' reasonable suspicion." *Jackson v. Sauls*, 206 F.3d 1156, 1166 (11th Cir. 2000). Under the "arguable reasonable suspicion" standard, "a law enforcement officer who conducts an unconstitutional search based upon a

reasonable but mistaken conclusion that reasonable suspicion exists is entitled to qualified immunity." *Brent v. Ashley*, 247 F.3d 1294, 1303 (11th Cir. 2001). "In undertaking the arguable reasonable suspicion inquiry, this Court must examine the totality of the circumstances to determine whether an officer had a 'particularized and objective' basis to support his suspicion." *Whittier v. Kobayashi*, 581 F.3d 1304, 1309 (11th Cir. 2009) (quoting *Brent*, 247 F.3d at 1304). "Whether the officer's suspicion ends up being mistaken is immaterial so long as it was reasonable." *Id.*

In Florida, police officers may lawfully stop a vehicle if the officer suspects that the vehicle's side or rear windows are tinted more than the amount allowed for by law. *See* §§ 316.2953 & 316.2954(1)(a), Fla. Stat. "The officer need not be right about the level of tinting—so long as his mistake is reasonable, the seizure is lawful under the Fourth Amendment." *United States v. Longoria*, 183 F. Supp. 3d 1164, 1166 (N.D. Fla. 2016) (citing *United States v. Jackson*, 558 F. App'x 932, 933–35 (11th Cir. 2014)).

In this case, Officer Mamone purportedly stopped Plaintiff because he suspected that Plaintiff's vehicle's windows were tinted in excess of the amount of tinting allowed for by law. (Doc. 28-3 at 27:9–17). The police body camera video shows that Plaintiff's windows could not easily be seen through. (*See, e.g.*, Video 1 at 17:48:02). During the traffic stop, the tint meter indicated that the front window was tinted at or above the statutory maximum and that the rear

18

window tint violated the law. (Video 2 at 17:52:18–17:52:40). Plaintiff claims that the window tint was at or just below the statutory maximum, (Doc. 28-1 at 48:18–25; Doc. 28-4 ¶ 7), and record evidence suggests that the human eye cannot differentiate between windows tinted at the statutory maximum from windows tinted in excess of the legal amount. (Doc. 28-4 ¶ 7). Thus, based on the totality of the circumstances, the Court concludes that Officer Mamone had at least arguable reasonable suspicion to justify the traffic stop because Plaintiff's dark windows constituted a particularized and objective basis to support Officer Mamone's suspicion that the windows were tinted in excess of the legally allowed amount. *See also United States v. Weaver*, 145 F. App'x 639 (11th Cir. 2005); *United States v. Collins*, No. 23-10322, 2024 WL 3949946 (11th Cir. Aug. 27, 2024).

Plaintiff contends that Officer Mamone "fabricated" the tint violation in order to punish Plaintiff for voicing his displeasure over being found at fault for the accident. (Doc. 30 at 4). Plaintiff also points out that Officer Melville asked Officer Mamone whether the stop was a "P.O.P." But it is well-established that "the Fourth Amendment's concern with 'reasonableness' allows certain actions to be taken in certain circumstances, *whatever* the subjective intent." *Whren v. United States*, 517 U.S. 806, 814 (1996) (emphasis in original). Here, the traffic stop was lawful because arguable reasonable suspicion existed that Plaintiff's window tint violated the law. Even assuming that Officer Mamone had

malicious intent, the Court may not consider his subjective motivations. *See also Smith v. Centurion of Florida, LLC*, No. 5:18-cv-545-Oc, 2020 WL 7074557, at *4 (M.D. Fla. Dec. 3, 2020) (finding that "threatening, demeaning, or abusive comments do not rise to the level of a constitutional violation").

Plaintiff argues that the Supreme Court's decision in *District of Columbia v. Wesby* helps demonstrate that Officer Mamone violated a clearly established constitutional right in this case. 583 U.S. 48 (2018). In *Wesby*, the Supreme Court found that qualified immunity was available to police officers who arrested partygoers during a "bachelor party" being held at a vacant house without the consent of the property owner. *Id.* at 65. Plaintiff does not explain how *Wesby* should inform the Court's analysis of this case. Thus, this argument is rejected. *See United States v. Markovich*, 95 F.4th 1367, 1379 (11th Cir. 2024) (rejecting a "conclusory argument "because the party advancing it "d[id] not explain [its] legal basis").

Plaintiff also notes that his expert witness, Michael Pearl, opined that racial bias in policing may violate the Equal Protection Clause of the Fourteenth Amendment as well as the Fourth Amendment, (Doc. 30-2 at 8), and that Deputy Veléz noted that Officer Mamone treated Gentry, who is White, more favorably than Plaintiff, who is Black. (Doc. 30-1 at 9). But Plaintiff did not plead that he was racially discriminated against during the accident investigation. Thus, the Court will not consider this argument. *See Gilmour v. Gates, McDonald &*

*Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment.").

**B.    Claims Against the City**

"Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). Municipal liability under *Monell* is "derivative of—and thus requires—an underlying constitutional violation." *Aracena v. Gruler*, 347 F. Supp. 3d 1107, 1120 (M.D. Fla. 2018) (quoting *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)). Because the Court concludes that no constitutional violation occurred, the Court must grant summary judgment in favor of the City on Plaintiff's *Monell* claim. *See also Knight ex rel. Kerr v. Miami–Dade Cnty.*, 856 F.3d 795, 821 (11th Cir. 2017)).

**IV.    CONCLUSION**

For the reasons given above, it is **ORDERED** that Defendants' motions for summary judgment (Docs. 28 & 29) are **GRANTED**. The Clerk is directed to enter a judgment providing that Plaintiff takes nothing from Defendants on any of his claims in this case. The Clerk shall then close this case.

**DONE** and **ORDERED** in Orlando, Florida, on February 17, 2025.

JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record